Sullivant v. Jahren.

---

S. L. SULLIVANT V. A. O. JAHREN *et al.*

No. 14,000.   (79 Pac. 1071.)

SYLLABUS BY THE COURT.

1. AGENCY—*Real-estate Broker—Scope of his Authority.* A real-estate broker or agent is one who negotiates sales of real estate. His business generally is to find a purchaser who is willing to buy on the terms fixed by the owner; that is, to bring the owner and a purchaser together. He has no implied authority to bind the principal by signing a contract of sale. Nor has he such authority to fix terms of sale, time of possession, or the covenants to be contained in the deed. Nor can he materially change the terms of sale fixed by the principal, without the latter's consent. He is a special agent, and must pursue his instructions and act within the scope of his limited powers; and those who deal with him, if he exceed his authority, do so at their peril.

2. —— *Agent's Authority Held a Question of Law.* The authority given by the owner of the land to his agent in this case was all embodied in letters and a telegram. Not being ambiguous, what they mean is a question of law and not of fact, and this court is not hampered by the findings of fact made by the trial court as to the meaning of these writings.

Error from Butler district court; GRANVILLE P. AIKMAN, judge. Opinion filed March 11, 1905. Reversed.

*Henry E. Ganse,* and *H. W. Schumacher,* for plaintiff in error.

*Hamilton & Leydig,* and *E. N. Smith,* for defendants in error.

The opinion of the court was delivered by

CLARK A. SMITH, J.: A. O. Jahren brought this suit in the district court of Butler county against his codefendant in error, Theodore Weyant, and the plaintiff in error (to whom Weyant had conveyed the land), for the specific performance of a contract of sale of certain land in that county from Weyant to Jahren. Judgment was rendered for the plaintiff below, and Sullivant brings the case to this court for review.

On May 30, 1898, Weyant wrote a letter dated at Columbus, Ohio, where he resided and continued to reside during all the negotiations in question, and addressed the same to "Real-estate Agent, Rosalia, Butler county, Kansas," which letter came into the hands of J. C. Songer, a real-estate agent of that place. The letter described the land in controversy, about 960 acres, and related to the leasing of the same, except these words: "Or, if you have a customer who wants to purchase, the land is for sale."

Having received an answer from Songer in the meantime, on June 13, 1898, Weyant wrote a postal card to Songer in which the only reference to the sale of the land was the following:

"What had this land ought to sell for? Have you a customer that would buy, or give a good trade? If so, let me know."

A number of letters passed between Songer at Rosalia, Kan., and Weyant at Columbus, Ohio, in regard

to the price of the land and prospective purchasers, but nothing conferring any authority by any possible construction, or as to a definite proposition of sale, until the following letter:

"COLUMBUS, OHIO, June 4, 1900.

"*J. C. Songer, Rosalia, Kan.:*

"DEAR SIR—Regarding the 960 acres of land in your county, I instructed Mr. S. E. Black, of El Dorado, to lease the land for the grass season of 1900, but to make the lease subject to sale, which I suppose was accordingly done. . . . I will sell your customer the 960 acres of land at $2.50 per acre [the price offered by him], subject to the lease made as above stated, and for this sale I will give you a commission of $75. This sale is to be for cash, upon delivery of deed and abstract showing good title, at the bank of El Dorado, Kan.

"Please reply to this at once, and oblige,

Yours respectfully,     THEO. WEYANT..

"Advise me as to consideration and to whom you want deed."

To which Songer replied as follows:

"ROSALIA, KAN., June 11, 1900.

"*Theodore Weyant, Columbus, Ohio:*

"DEAR SIR—Yours of June 4 regarding the 960 acres in this county received.

"My customer has been gone till yesterday. I have seen him and he says he will not pay $2.75 or $2.62½ per acre for the land. There is no use to try to get any more out of him for the land. He is trying to deal for other land here, and says if he gets it he does not want your land. Now, I do not feel like taking less than five per cent. commission for making the sale.

"You are getting from $500 to $700 more for your land than it can be sold to any one else for, and getting the cash for the land. I told him what you had offered me as commission, and that I would not take less than five per cent., and if he would pay me enough over the $2.50 per acre above what you offered me to make my commission five per cent. that I would submit to you the proposition. He finally agreed to pay me enough over what you offered me to make my commission five per cent. Now, if that is satisfactory

9—71 KAN.

with you, telegraph me on receipt of this, so that I can close the deal with him before he makes other purchases, as he only agreed to wait a few days.

"Make deed to A. O. Jahren, consideration $2400, and send deed and abstract showing good title to Farmers' and Merchants' National Bank, El Dorado, Kan., to be delivered upon payment of the $2.50 per acre, less the $75 to be paid to me as commission.

Yours respectfully,      J. C. SONGER. ·

"P. S.—Instruct bank to pay me the $75."

To which Weyant replied with the following telegram:

"Received at S 4:30 P. M.            6-13-189..
"Dated Columbus, Ohio, 13.

"*To J. C. Songer, Rosalia, Kan.:*   Accepted; particulars by letter; papers sent to bank. ·

THEO. WEYANT."

On the same day Weyant wrote and mailed the following letter:

"COLUMBUS, OHIO, June 13, 1900.
"*J. C. Songer, Rosalia, Kan.:*

"DEAR SIR—Replying to your letter of June 11, I will accept $2400 for the 960 acres of land, and pay you $75 commission.

"I will give warranty deed for the land, free from encumbrance, excepting the lease made by S. E. Black, who was instructed to lease the land subject to sale. Abstracts and other papers will be sent to the Farmers' and Merchants' Bank of El Dorado, with instructions to turn the papers over on receipt of $2400, out of which you are to have $75 commission. My interest in the lease will be assigned to your purchaser.

"There is some taxes to be paid, but I will instruct the bank to deduct the amount, whatever it is, from the $2400.

·"Regarding the lease above referred to, Black was instructed to lease the land subject to sale, which, if done as instructed, would not affect our deal, as Black wrote me that he had leased the land, according to instructions, at fifteen cents per acre.

"The papers will go forth to-day to the bank, and the deal can be closed up without delay.

Yours very respectfully,      THEO. WEYANT."

There were no personal interviews between Songer and Weyant, and these are the only writings that could bear upon Songer's authority as agent of Weyant.

Three days after the date of this last letter and telegram, and after such letter and telegram had been received at Rosalia, Kan., Songer undertook, as the agent of Weyant, to execute with A. O. Jahren a written contract, signed by Jahren and by Songer, affixing Weyant's name thereto by himself, as agent. Among the provisions of that contract is the following:

"In consideration of which said party of the second part [Jahren] covenants and agrees to pay unto said party of the first part [Weyant], for the same, the sum of twenty-four hundred ($2400), dollars, as follows: On delivery of warranty deed and abstract of title showing perfect title in said Theodore Weyant, and delivery of possession of said above-described premises to said A. O. Jahren, possession of said premises being the essence of the time of payment."

This correspondence between Weyant and Songer did not authorize Songer to make any written contract whatever for the sale of Weyant's land; indeed, it is evident that no written contract was contemplated or was in any way necessary. The deed forwarded by Weyant was all the contract necessary on his part, and the acceptance of the same and the payment of the money was all that was to be done on Jahren's part. Even if the written contract had been necessary, and had been authorized by Weyant, there was an utter want of authority to embody in the same the provision above copied.

A broker employed to sell lands has no implied authority to sign a contract to sell on behalf of his principal; but if he had such authority, if the contract varies from his instructions the principal will not be bound by it. (*Morris v. Ruddy,* 20 N. J. Eq. 236.)

It is claimed that Weyant ratified the written contract. Before one can be held to have ratified a con-

tract he must have full knowledge of what the contract is, and neither Songer nor the attorneys of Jahren who wrote to Weyant on the day the written contract was made, after the making of the same, even hinted to him that the writing had been made. In fact the letter of Jahren's attorneys, written almost immediately after the execution of the contract, not only omits any reference to the contract, but says:

"Mr. Jahren purchased this with the distinct understanding that he was to have possession on payment of purchase-price and delivery of deed."

Following this is a proposition for a new contract, viz., that Weyant deduct eighty-five dollars from the purchase-price.

It is difficult to interpret Jahren's conduct in making the contract as having been in good faith. Yet he asks a court of equity to compel a specific performance of the contract. His equitable claims are, to say the least, doubtful. The legal questions as to the validity of the contract upon which he sues are against him.

Weyant gave Songer no express authority to make a written contract, and no such authority is implied. Jahren was bound to inquire as to Songer's authority at his own peril. The contract as made was not in conformity with Weyant's proposition of sale, and hence would have been invalid if it had been authorized to be made according to such proposition. (*Duffy v. Hobson,* 40 Cal. 240, 6 Am. Rep. 617; *Treat v. De Celis,* 41 id. 202; *Everman v. Herndon,* 71 Miss. 823, 15 South. 135; *Morris v. Ruddy,* 20 N. J. Eq. 236; *Halsey v. Monteiro,* 92 Va. 581, 24 S. E. 258; *Carstens v. McReavy,* 1 Wash. 359, 25 Pac. 471; 4 A. & E. Encycl. of L. 964 [note] ; Mech. Ag. §966.)

Some of these cases involve only the right of the agent to recover his commission for making a sale. An agent may proceed so far in execution of the purpose for which he is employed as to entitle him to his commission and still be far short of consummating a

contract upon which a suit for specific performance could be sustained against his employer. (*Helling v. Darby, ante*, p. 107, 79 Pac. 1073.)

The following from *Carstens v. McReavy, supra*, seems applicable to this case:

"We cannot shut our eyes to the obvious defect in the argument that authority to sell, in this instance, necessarily implies authority to execute a contract. A sale of land, 'executed with effect,' includes the execution of a deed and the delivery of possession, neither of which the agent can do, unless his authority to sell is supplemented by the delivery of possession to him and a power of attorney to convey. So that he does not, although in possession of the authority to *sell*, have all the necessary means of executing that authority with final effect. He stops short somewhere, and when we are inquiring where the probable and proper place of his stoppage is, the evils that would attend the extension of his actual authority beyond the finding of a purchaser furnish ample reason for fixing his limit there. An agency of this kind may be created by the slightest form of words, without any writing, leaving it to litigation to determine whether the substance of the authority is 'to sell' or 'to find a purchaser,' wherein the unscrupulous and dishonest agent would be at once arrayed as the principal witness against his client, with every advantage, from some note, 'made at the time,' of what the instruction was. Perjury would go at a premium in such cases, and the confiding and unlettered would be its victims. Scarcely any man, when listing his property with a real-estate agent, stops to give details either as to the property itself or as to the arrangements he desires to make, yet no one would sell upon equal terms to a first-class business man and to an habitual drunkard, or well-known insolvent; and the ordinary owner would not sell at all to a person whose very occupancy would tinge the neighborhood with a bad repute. These are good reasons, and are, probably, some of the reasons why custom and the law have made it not necessary that real-estate agents should actually procure contracts in order to earn their compensation; and why, in this connection, the common understanding of the phrase 'authority to sell' means only au-

thority to find a purchaser, whether the authority be given orally or by written request."

The trial court made certain findings of fact as to the authority of the agent to make this contract. The authority given by the owner of the land to his agent in this case was all embodied in letters and a telegram. Not being ambiguous, what they mean is a question of law and not of fact, and this court is not hampered by the findings of fact made by the trial court as to the meaning of these writings.

The judgment is reversed.

All the Justices concurring.