Shepherd v. Whitmore.

---

No. 22,614.

J. M. SHEPHERD, *Appellant,* v. WILLIAM WHITMORE, as Executor, etc., et al., *Appellees.*

### SYLLABUS BY THE COURT.

1. SALE OF REAL ESTATE—*Property Listed With Agent—Agent Without Authority to Make Binding Contract with Purchaser.* Correspondence between a real-estate broker and the executor of an estate with authority under the will to sell real property, is held to show a mere listing of the real estate with authority in the broker to find a purchaser, and held that a written contract made by the broker with a purchaser is not binding upon the executor, and (following *Haggart v. King,* ante p. 75; *Wiggam v. Shouse,* 105 Kan. 637, 185 Pac. 896, and authorities cited in those cases) further held that the broker had no authority to bind the executor by a written contract with a purchaser.

2. SAME—*No Ratification of Contract by Principal.* In an action to enforce such a void contract, it is held that the evidence is sufficient to sustain a finding that the executor had not ratified the contract.

3. SAME—*Cancellation of Deed and Release of Mortgage Properly Decreed.* The evidence is further held to sustain a judgment for the cancellation of the executor's deed which the purchaser obtained from a bank and placed of record, and for the release of a mortgage he had placed on the land.

Appeal from Lyon district court; WILLIAM C. HARRIS, judge. Opinion filed July 10, 1920. Affirmed.

*W. L. Huggins, O. T. Atherton,* and *R. E. Boynton,* all of Emporia, for the appellant.

*F. A. Meckel,* of Cottonwood Falls, *R. M. Hamer, H. E. Ganse,* both of Emporia, *John M. Hamilton,* and *Ernest M. Hamilton,* both of Bellefontaine, Ohio, for the appellees.

The opinion of the court was delivered by

PORTER, J.: This is an appeal from a judgment denying plaintiff specific performance of a contract for the conveyance of real estate.

The land in question consists of a farm of 240 acres in Lyon county which belonged, in his lifetime, to Jonathan J. Whitmore of Logan county, Ohio. He died, and under the terms of his will his executor, William Whitmore, was authorized to sell all the real property of the estate without an order of court. The plaintiff lives near the land in Lyon county, and in his petition alleged that E. Cotton, acting as agent of the executor, and under written authority, sold to plaintiff by written contract the farm, also the wagon scales on the farm, telephone and telephone shares; that in the contract the defendant agreed to give plaintiff possession of the premises on March 1, 1919; that the written contract was thereafter ratified, confirmed and partly performed by the executor; that plaintiff was at all times ready, willing and able to fully perform all of the terms of the contract on March 1, 1919; and that the defendants, Whitmore, executor, and Cotton, as agent, failed to perform the contract according to its terms and refused to convey the land as agreed and failed to give plaintiff possession; that defendant, W. V. Gibbs, was a tenant in possession of the premises and refused to vacate, and on March 27, 1919, the executor and his agent informed plaintiff that the executor would not be responsible for giving possession of the land; that if plaintiff desired to take the land under the contract he must immediately accept a warranty deed, which deed reserved to defendant Gibbs his share of the growing crops; that for the purpose of procuring money to make the purchase, plaintiff had sold a farm and had negotiated a loan covering the land in question and other land, and for these reasons and in order to mitigate his damages he was compelled to accept the deed as tendered; that he is entitled to the immediate possession of the premises, has the legal and equitable title thereto, and that the defendants are unlawfully keeping him out of possession. He asked for an order of the court directing the executor, and Cotton, as his agent, to specifically perform the terms of the contract and give him

possession of the premises, and that he recover from the executor and Cotton, actual damages in the sum of $1,000 and interest from March 1, 1919. He also prayed for $200 damages against the defendant Gibbs.

William Whitmore, executor, filed an answer and cross petition. The answer denied that Cotton was the agent of the executor or that he had authority to represent the executor in any of the matters alleged in the petition, and denied generally the averments of the petition.

For his cross petition the executor alleged that on or about October 1, 1918, E. C. Cotton solicited the price at which the executor would sell the property in controversy; that after considerable correspondence between them relative to the sale of the farm, copies of which were attached to the cross petition, the defendant agreed to sell the farm to Shepherd for $15,600, but at no time agreed to deliver possession of the farm on March 1, or any other time. It was further alleged that Shepherd, the plaintiff, had actual notice and knowledge of the contents of the correspondence between the executor and Cotton, and that defendant Gibbs was in possession of the land under a lease terminating March 1, 1919; that Shepherd, the plaintiff, had knowledge of the rights of Gibbs as tenant in the land; and that as executor he at no time entered into or executed a written contract for the sale of the land. The only agreement he had was contained in the letters and telegrams, copies of which were attached. The cross petition further alleged that in keeping with the correspondence, Whitmore had executed an executor's deed conveying the lands to the plaintiff, deposited the same in a bank at Bellefontaine, Ohio, to be forwarded to the Miller State Bank, of which Cotton was cashier, with draft on the Miller State Bank for the sum of $15,600; that the deed and draft were forwarded to the bank with instructions to deliver the deed to Shepherd upon his payment to the bank of $15,600; that Cotton, acting for himself, and as agent of plaintiff, and as officer of the bank, delivered the deed to the plaintiff and received from him $15,600, and on the same day made a draft for that sum payable to the People's National Bank of Bellefontaine, Ohio, and deposited the same in the post office at Miller, Kan., of which J. R. Shepherd, son of the plaintiff, was postmaster, who, acting in collusion with

plaintiff for the purpose of cheating and defrauding the defendant executor and the estate of Jonathan J. Whitmore, deceased, caused the draft to remain in the post office at Miller for two days after it had been regularly mailed, and that by false statements in affidavits, plaintiff procured garnishment proceedings and a restraining order to be served on Cotton, who in the meantime procured from the postmaster the return of the draft, thereby preventing the executor from receiving the purchase money for the farm. He alleged that the plaintiff had never accepted the terms of the defendant's offer to sell the farm, and he, as executor, elected to withdraw his offer to sell the farm to plaintiff, and asked for the cancellation of the deed and the release of a mortgage placed on the land by Shepherd, and that the $15,600 in the hands of the Miller State Bank be paid into court to satisfy the mortgage. Attached to the answer and cross petition were copies of the executor's deed and the correspondence which passed between the executor and Cotton.

The court appointed a receiver to take control of the real estate. The case was tried to the court, and judgment was rendered in favor of the Whitmore estate and against the plaintiff. William Whitmore, the executor of the estate, died, and the judgment recites that his successors have been substituted as defendants. The court held there was no contract for the sale of the land between plaintiff and the executor, and that the executor's deed was never delivered, and it was ordered canceled. The mortgage placed on the land by the plaintiff was ordered released.

The principal error complained of is the finding of the court that there was nothing in the correspondence authorizing Cotton to enter into any contract on behalf of the executor. It is conceded that power to sell, as ordinarily applied to real-estate brokers, means authority to find a purchaser, and not authority to close the deal and make a contract of sale, but it is insisted that this rule cannot be applied in the present case.

After preliminary correspondence between the executor and Cotton, beginning in July, 1918, the executor fixed a price on the land and requested Cotton if he had any purchasers at that figure "to proceed to do business" and the executor would pay him the usual commission. On October 23, in answer to one of Cotton's letters, he wrote:

"I have decided to say that if you can sell to this party at $70 per acre to let it go."

On January 18, 1919, Cotton wrote to the executor:

"I have sold the farm at $65 per acre, or a total of $15,600, a payment of $1,000 cash and the balance of $14,600 will be paid March 1st, 1919. I will have to get a loan on the farm for the man and will need the abstract the first thing. Possession is to be given March 1st and the deal completed."

On January 20, the executor wrote:

"You said you had sold the farm but did not say anything about Mr. Gibbs and the wheat, and I am wondering if you had an understanding with him. . . . We are enclosing the abstract. Please let us know at once what arrangements you have made with Mr. Gibbs."

This was followed three days later by a telegram to Cotton, as follows:

"Don't close any deal for sale of farm without written instructions from me."

And on the day following, the executor wrote:

"Confirming my telegram to you of January 23d, 1919, I desire to say that I cannot comply with your request to sell the Kansas farm and agree to give possession of same March 1st, 1919, or until such time as I have the farm in my possession."

On January 24, Cotton wrote the executor, saying:

"Received the abstract to the land and wire message. We have made contract of sale to the farm as stated in our previous letter receiving payment of $1,000 down and the balance to be paid March 1st, when possession is given. . . . I suppose Mr. Gibbs is writing you all kinds of letters threatening to make you trouble and collect damages and the like. Do not get scared. . . . He has no need to kick as the man will pay him what he has put in to the wheat sown or take the share agreed upon. He will treat him all right he tells me."

On the 27th of January, the executor wrote to Cotton:

"Your letters received three in a bunch to-day, which eases up matters with us very much. We were very uneasy not knowing what claims Mr. Gibbs might put up to the place, fearing he might have picked up something from our correspondence with him about the wheat that would give him permission to hold it for another year. The Gibbs deal is all that we know of that might happen to cause trouble in getting this sale through and we believe from your letters that everything will be all right."

On January 19, Cotton wrote to the executor:

"Mr. J. M. Shepherd, the man who purchased the place, was in yesterday and said he had talked with Mr. Gibbs, and we would have no

trouble at all with him, he said, as he understood the situation better now. . . . I am arranging matters so as to run smoothly and at the time that we close the deal March first the land will be turned over peaceably to Mr. Shepherd and the cash will be paid to the estate in full, $15,600."

In a letter dated February 12, the executor stated to Cotton:

"Mr. Gibbs wrote regarding the wheat. Our agreement with him was, 'That if he put out any wheat he was to have the privilege of returning to harvest and thrash the same and to give us or the purchaser the customary grain rental.' This agreement will have to be made a part of the deed. If Mr. Gibbs and the purchaser make a different agreement that will be their deal."

On March 1, the attorneys for the executor sent to Cotton certified copies of the will and probate proceedings in the Whitmore estate, and on the same day sent direct to the Miller State Bank, as an ordinary collection, an executor's deed with draft attached for $15,600, the deed to be delivered upon payment of the draft. The executor's deed contained the statement that "The tenant's share of the now growing wheat crop is hereby reserved to the tenant, W. V. Gibbs." The next day the executor wired Cotton as follows:

"Sent deed yesterday. Hold same until I write you."

On the same day he wrote:

"In regard to deed which I asked you to hold, I want you to hold the same until I have a better understanding regards the wheat. . . . I don't want this deed turned over to Mr. Shepherd until the wheat question has been settled. As regards the chattels which you put in the contract I can't say yet what I can do regarding the same. The telephone we can't deliver as it belongs to Gibbs. As regards the telephone right and line we can't say about this until we hear from Mr. Shultz, who had it put in & paid for the same. Don't deliver this deed until I notify you to do so."

The next day Cotton wired:

"Your telegram at hand. Will hold deed as instructed."

March 10, the executor telegraphed the bank to deliver the deed to Shepherd upon payment of the draft attached to the deed. On March 17, Cotton wrote that—

"The possession of the farm is holding the closing of the deal up. . . . Let me hear what you say in regard to the matter."

On March 19, the attorneys for the executor wrote the Miller State Bank that unless the draft was paid at once to return the

deed with draft to the bank in Ohio from which it had been received.  On the same day Cotton wrote the executor, "We have had a lawyer look at our contract with Mr. Gibbs," and that in the opinion of the lawyer there would have to be an arbitration, and said:

"Now as it seems impossible for Mr. Shepherd and Mr. Gibbs to agree upon the value of the wheat and Mr. Gibbs still is in possession of the place it will be necessary for you to follow the contract and arbitrate with him and pay him off for the wheat before you can get possession."

In the meantime the plaintiff had employed attorneys and had verified the petition to be filed in this case.  Cotton was a witness, and admitted that on March 22 he was in the office of plaintiff's attorneys, where he wrote a letter to the executor, inclosing an agreement to guarantee Shepherd possession of the farm, in which he told the executor to sign and return the agreement and thereupon Shepherd would pay in the full price of the farm, which would be sent to the executor at once.  He testified that Shepherd paid the money into the bank, and that he, as cashier, sent a draft for the amount to the bank at Bellefontaine, Ohio; that he deposited the letter in the post office on Friday, the 28th, and on the next morning ordered the postmaster to hold the letter; that the postmaster told him Saturday evening that he should either send the letter or return it; that no mail leaves Miller on Sunday, and that on Monday morning before the mail went out witness went to the post office and got the letter back.  He was served with a restraining order on March 28, after he had deposited the letter in the post office.  On March 29, he wrote the executor:

"Mr. Shepherd paid for the farm yesterday and took the deed and immediately, while we were in the act of mailing a draft, . . . he had papers served on us restraining us from making payment."

Later on he wrote suggesting that the executor come or send someone to settle matters with Gibbs so as to give Mr. Shepherd possession before the trial and save extra expense. In a letter in reply, the executor sharply criticised his actions. Cotton answered, stating that he mailed the letter March 28, "but took it back at the order of the court and will forward it as soon as released."

The trial court held that there was nothing in the correspondence or in the understanding between the parties that authorized Cotton to enter into any contract for the executor;

that the evidence showed that neither the contract nor a copy of it was ever sent to the executor, and that none of the details were ever submitted to him. In our opinion the correspondence shows nothing more than the usual and ordinary listing of real estate with a broker for sale, giving him authority to find a purchaser. The question has been before this court so often that further discussion of it would be superfluous. In the recent case of *Haggart v. King,* ante, p. 75, it was said in the opinion:

"It has been held that under the usual contract by which a landowner, lists his property for sale with an agent, the latter has no authority to make a written contract that would be binding upon the owner. (*Sullivant v. Jahren,* 71 Kan. 127, 79 Pac. 1071; *Wiggam v. Shouse,* 105 Kan. 637, 185 Pac. 896, and cases cited in the opinion.)" (p. 77.)

Aside from a total want of authority on the part of Cotton to make a contract for the sale of the land binding upon the executor, he had no authority to make a contract that required possession to be given on March 1, or for a warranty deed, or to contract for the sale of personal property, something not mentioned in the correspondence.

It is contended, however, that the executor ratified the contract, and that the estate is estopped to deny Cotton's authority to enter into it. We are unable to find in the correspondence anything to indicate that the executor knew until after the suit was brought that any written contract had been entered into; nothing to indicate that such contract, or a copy of it, had ever been sent to him. Nor can it be said that he ever consented to give possession on March 1, except upon the condition, which he insisted upon all through the correspondence, that the purchaser settle with the tenant. In the first letter written after notice that a purchaser had been found, the executor said:

"I am wondering if you had an understanding with him [Gibbs]."

Time and again, he was assured by Cotton that he need not be alarmed about any complications with Gibbs—that everything would be arranged satisfactorily to the tenant. Becoming apprehensive that there might still be trouble with the tenant, the executor telegraphed to Cotton:

"Do not close any deal for sale of farm without written instructions from me."

The telegram was confirmed by a letter in which the executor said that he could not comply with Cotton's request to sell the farm and agree to give possession March 1. In response he was assured by Cotton that he had been informed by the purchaser that he would treat the tenant all right. In all correspondence the executor manifested a desire, not only to protect the tenant from any annoyance, but a desire not to be involved in any way in litigation or trouble arising out of any attitude the tenant might take with respect to possession, and as late as January 27 the executor wrote:

"The Gibbs deal is all that we know of that might happen to cause trouble in getting this sale through and we believe from your letters that everything will be all right."

He was again assured that Cotton was arranging matters "to run smoothly," and that on March 1, "the land will be turned over peaceably to Mr. Shepherd and the cash will be paid to the estate in full." Full knowledge of all the material facts was essential before the doctrine of ratification could apply. Upon the question of ratification, the court said, in ruling upon the motion for a new trial:

"I have found nothing in the correspondence that would indicate a ratification, or an intention to ratify the contract, on the part of the executor, as claimed."

We think the trial court took the proper view of the question of ratification, and that the evidence abundantly sustains the holding that in sending the deed to the bank to be delivered to the plaintiff, the executor was relying upon Cotton's assurances that there would be no trouble or complications with the tenant, and that as soon as he discovered the truth, he promptly wired the bank to return the deed unless it was accepted immediately.

Finally, it is insisted by plaintiff that he bought the land and paid for it, that the executor sent the deed to the bank with directions to deliver to him upon payment of the agreed price, and that while he may not be entitled to a decree for specific performance, he is entitled to hold the deed, and that the court erred in ordering its cancellation. The view of the court on this question, after having heard the oral testimony of Shepherd and Cotton, appears from the court's language in overruling the motion for a new trial:

"As to the argument that Shepherd bought the land and paid for it under the proposition that the executor made: He did not do that in good faith; Shepherd never intended to purchase under the conditions laid down by the executor; he never accepted the proposition that was made by the executor.

"It is true that Shepherd paid his money into the bank, but before he did so he made preparation . . . immediately to sue the executor and tie up that money so that it could not reach the executor. There is no question at all about that. . . .

"Mr. Shepherd's only reason for making the payment was to get possession of that deed, get it of record and sue the executor to make him "come through" with the contract that he (Shepherd) had proposed in the first instance.

"It developed in the trial of this case on the receivership that Shepherd's son was postmaster at Miller, a town in the vicinity of this property. The plan was so laid that, when Shepherd paid the money, and the draft was issued by the bank, and the letter containing the draft was placed in the post office, it lay in the post office long after it should have started to its destination, and that Cotton, for some reason, withdrew that letter, took it back to the bank and held it in his possession.

"If Shepherd, in good faith, had intended to accept and carry out the contract that the executor had proposed to him, he would have paid his money and received the deed and that would have been the end of it. . . .

"I believe Shepherd has not acted in good faith . . . and that he has placed himself in a position where he cannot plead equities."

Doubtless the court was impressed with the evidence of collusion between plaintiff and Cotton, aided by plaintiff's son, who was postmaster, and by the bank, to allow plaintiff to secure possession of the deed by a colorable payment of the money into the bank with an understanding that it would be tied up by a suit already agreed upon. Neither the bank nor Cotton had authority to enter into any arrangement to aid plaintiff in a scheme to involve the estate in this litigation. Both Cotton and the bank were the agents of the executor, and good faith required Cotton to protect the interests of the executor. The evidence was sufficient to sustain a finding that he not only failed to do this, but that he rendered assistance to plaintiff to enable the latter to gain an advantage over the executor. The court heard considerable oral testimony, including that of plaintiff, who testified that he paid Cotton the money for the deed, had read the deed before receiving it, and was familiar with it; that before Cotton delivered the deed he understood the estate would not attempt to furnish him

possession of the land, and that he had to accept the deed and pay the money in order to hold the farm, and that he "supposed" arrangements were made for a restraining order to tie up the money in the hands of the bank. There was the testimony of Cotton to the effect that before he entered into the written contract with Shepherd he informed him of the executor's statement in regard to the claims of the tenant, and that he had explained to him the position of the estate with regard to the wheat and to Gibbs' right in the land, and that Shepherd promised to do the "fair, square thing," and to pay Gibbs what the wheat was worth. To some extent this was contradicted by Shepherd, who testified he had never seen any of the letters and never knew what their contents were, but the court heard the witnesses and reached the conclusion that Shepherd had not acted in good faith, and that there was collusion between him and the executor's agent. Under these circumstances, in our opinion, the court was justified in ordering the executor's deed cancelled and in holding that plaintiff was not in a position to ask equitable relief.

The judgment is affirmed.