No. 46,786

K V Homes, Inc., *Appellant*, and Albert C. Becker and Clyde Glandon, (Intervenors) *Appellees*, v. Wyandotte Lodge No. 3 of Ancient Free and Accepted Masons, and Leonard Childers, *Appellees*.

(510 P. 2d 1250)

Opinion filed June 9, 1973.

*Richard L. Reid*, of Steineger and Reid, of Kansas City, argued the cause and was on the brief for appellant.

*Blake A. Williamson*, of Williamson, Cubbison and Hardy, of Kansas City, argued the cause, and *Donald A. Hardy*, of the same firm, was with him on the brief for appellee Wyandotte Lodge No. 3 of Ancient Free and Accepted Masons.

*Edward H. Powers*, of Kansas City, argued the cause and was on the brief for appellee Leonard Childers.

*Joseph T. Carey*, of Dear, Yarnevich and Carey, of Kansas City, argued the cause and was on the brief for appellees Albert C. Becker and Clyde Glandon.

The opinion of the court was delivered by

Harman, C.: The principal action is for specific performance of a real estate contract, brought by the buyer against the owner-seller, and for damages against both the owner and the real estate broker who arranged the sale. Intervenors in the action seek specific performance of a subsequent sale contract entered into between them and the owner, and the broker counterclaims against the owner for realtor's commission upon either of the sale contracts.

Trial to the court resulted in judgment against the plaintiff K V Homes, Inc., on its action for specific performance against the property owner Wyandotte Lodge No. 3 of the Ancient Free and Accepted Masons and for damages, judgment in favor of the intervenors for specific performance of their contract and allowance of the broker's commission on the latter sale. From these judgments the plaintiff has appealed.

We summarize the evidence adduced at trial. The appellee lodge owned a tract of land consisting of about 150 acres known as the Barker farm in the west part of Wyandotte county. One Sunday morning while at church appellee Leonard Childers, a licensed real estate broker, overheard one of the lodge's trustees mention the lodge's ownership of the tract. He knew that appellant K V Homes, Inc., a developer of housing projects, was looking for additional ground for development. He thereupon conversed with the lodge's secretary and on December 3, 1969, at K V's request, addressed a letter to the secretary stating he had clients who were interested in purchasing land for a housing development in the general area of the lodge's farm. Terms were proposed which included a six per cent realtor's commission. A meeting of the lodge's trustees with the broker and subsequent negotiation by the latter with K V culminated in the execution and signing of a written instrument by and between K V and the lodge, denominated option for purchase of real estate, and dated January 16, 1970. This contract was prepared by the broker upon a printed form used by him containing the following:

1. A total price of $371,000 for the purchase of the 150 acres by K V or assigns, 10 acres of which were to be deeded back by K V to the lodge in consideration of one dollar.

2. An earnest money deposit of $10,000 paid by K V to and receipted for by the broker.

3. Routine provisions for the seller to furnish an abstract showing merchantable title.

4. This clause as to payment of the balance of the purchase price:

"But if the abstract is made to show a good merchantable title, then purchaser herein shall receive a warranty deed and agrees to pay the balance of said purchase money, to-wit: $361,000.00 as follows: $71,000.00, cash upon delivery of deed. The purchaser shall execute a first mortgage in favor of the seller in the amount of $290,000.00 on said property . . . [to] bear interest at 7% per annum on the unpaid principal balance, and shall be payable in four annual installments of $72,500.00 each, plus interest. The first annual installment shall be due one year from the date of delivery of deed, and subsequent installments shall be due on the anniversary date of delivery of deed. . . ."

5. These provisos:

"The total estimated price of $371,000.00 is based upon $2,650.00 per acre for 140 acres, and the actual total price shall be determined by applying $2,650.00 per acre to the net acreage as determined by a survey by a licensed

surveyor, and shall be exclusive of the land to be conveyed to the purchaser and that part thereof taken for road purposes. If the actual total price is more or less than $371,000.00, the difference shall be deducted from or added to the payment of $71,000.00 provided herein.

"This contract is contingent upon approval of the property for residential development by the Federal Housing Administration and upon the ability of the purchaser to obtain necessary financing. In the event approval by the Federal Housing Administration and commitment for necessary financing cannot be obtained on or before May 6, 1970, this contract shall become null and void and the deposit of $10,000.00 shall be returned to the purchaser.

"A Real Estate Commission has been included in the sale price, and in the event this sale is consummated the seller shall pay to Leonard Childers, Realtor, a commission equal to 6% of the total actual sale price."

The contingency provision regarding financing and FHA approval of the property for residential development was put in the contract by the broker at K V's request as it was planning on building medium income housing and before FHA would insure ultimate home loans it had to approve the project.

The contract was signed by K V on January 16, 1970, and by the lodge on February 6, 1970. Thereafter the FHA looked at the property, thought it had good possibilities but withheld approval because it did not then know where I-435, a circumferential interstate highway loop around metropolitan Kansas City, was to be located. The eventual route was known to be somewhere in western Wyandotte county and FHA didn't want to be creating problems for other federal agencies by any action which might increase land acquisition costs.

The broker made to the lodge some explanation of the delay in securing FHA approval and at K V's request secured the following document duly executed by the lodge's trustees:

"MODIFICATION OF PROVISIONS AND CONDITIONS

"In connection with a contract to sell property in The Southwest ¼ of Section 1, Township 11, Range 23, Wyandotte County, Kansas,

"The Wyandotte Lodge # 3, Ancient, Free and Accepted Masons, by its Trustees, hereby grants to K V HOMES, INC., Purchaser an extension of 45 days from May 6, 1970, or until June 20, 1970, for meeting contingencies as provided in said contract, dated January 16, 1970. Said contingencies specifically include Approval by The Federal Housing Administration and the ability of the purchaser to obtain necessary financing.

"Extension is hereby granted this 6th day of May, 1970."

Thereafter public hearings were held by the state highway commission respecting location of the interstate loop and on June 8, 1970, it was announced that the highway would pass directly

across the lodge's farm. At this point, according to K V's evaluation, the tract became unsuitable for medium priced single family housing because it had become too valuable for that type housing—its value almost doubled upon announcement of the highway's exact location. However, from K V's standpoint, it was not certain just when the highway would be built and this made it indefinite as to how long the land would have to be held to realize its full value. Consequently it appeared advantageous to Ben Vineyard and Kenneth Kaul, who were the sole stockholders of K V Homes, to get the lodge to reduce the amount of the down payment for the purchase of its farm and to extend the length of time for paying off the balance. Accordingly negotiations along this line were commenced on June 15, 1970, with the broker.

There was some dispute in the evidence as to events occurring during the week commencing Monday, June 15th. Inasmuch as the trial court ruled against K V on these items, our further evidential recital will be so tailored, except where otherwise indicated.

The broker conferred with the master of the lodge respecting K V's request for further modification and the latter advised the lodge might be agreeable provided the contract was performed by June 20, 1970, the deadline fixed by the May 6th extension. The lodge's secretary and three trustees also indicated some possibility of modification but again with the proviso of performance by June 20th. The broker then prepared a rewritten version of a new contract, dated June 18, 1970, and on June 17, 1970, presented it to K V. This instrument, again prepared on the broker's printed form, provided for the same total purchase price of $371,000 for the tract but called for a down payment of only $50,000 instead of $81,000, with the remainder to be paid in six years instead of four. It contained no contingency provision for FHA approval or financing. This instrument was never signed by the lodge nor was another such contract dated June 19, 1970, prepared by Kaul and Vineyard and which contained some further changes respecting release of property from mortgage lien upon the making of annual payments. In relaying information to K V respecting the lodge's attitude toward further modification of the old contract the broker did state to Kaul and Vineyard the lodge's condition that it be done by June 20th.

Upon receiving information the lodge might be favorable toward modification of the contract Kaul and Vineyard started looking for investors to join them in the purchase. The broker suggested the

names of Albert C. Becker and Clyde Glandon, appellee-intervenors herein, who were Kansas City, Kansas, liquor distributors, and later approached them about engaging in the venture. Apparently, it eventually developed, they were unwilling to join in with persons with whom they were not acquainted; however, they expressed an interest in undertaking the entire project.

On Friday, June 19th, the broker met with Kaul and Vineyard in their office. Kaul and Vineyard testified the broker telephoned the lodge and relayed back his convesation with the lodge's secretary to the effect the lodge would be closed, the trustees would not be in town on the next day, Saturday the 20th, but it would be all right to close the deal on Monday the 22nd. (The lodge secretary denied talking over the telephone with the broker at the particular time; the broker testified he couldn't recall telephoning the secretary.)

The next morning, Saturday, June 20th, a group of investors met in the office of a Kansas City abstracting firm. Glandon and Becker had been expected but did not appear. The broker telephoned them and was advised they were not interested. The group present included Kaul and Vineyard; the broker; Joe Jenkins, a local abstracter; Dave Morton, Vineyard's St. Joseph, Missouri, attorney, and Hylton Harman, a local attorney. After discussion the group agreed to form a new corporation to take an assignment of K V's rights under its contract with the lodge. They discussed percentages of their participation and Morton prepared a rough draft of a subscription agreement for the new corporation, whose initial capital was to be $56,000—$50,000 for the down payment upon the lodge's farm and $6,000 for one year's operating expenses. Participation in the venture was to be as follows: Vineyard—16%; Kaul—14%; Morton—10%; Dwight L. Dannen, a client of Morton's—10%; the broker—10%; Jenkins—10%; Harman—10%, and Evelyn M. Kathrens, Kaul's sister—20%.

This Saturday meeting adjourned with the understanding the group would meet again at the abstract company office Monday morning, June 22nd, for the purpose of formally executing a subscription agreement and presenting their money to the broker to take to the lodge. Several of the group met as agreed on June 22nd with the result that when the broker left he had checks totaling $34,800, which amount, plus his own check for $5,600 and a like check from Harman, together with the $10,000 deposit he already had received from K V, would make the required $56,000. Harman failed to deposit his part with the broker—he preferred to wait and

see if the lodge would approve the new offer. The broker was concerned about approval and he testified that prior to leaving he told the group there was no assurance the lodge would accept the contract of the new group. This testimony was verified by that of Morton and Jenkins.

Thereafter, and on the same day, the broker secured $50,000 from Becker and Glandon. He also secured their signatures to a new contract to purchase from the lodge the tract in question for the same total sum of $371,000. The broker then met that night with the lodge officers. He did not present any money or the new offer of the K V assigns group to the lodge—instead he stated K V was no longer interested and he presented to lodge officers the Becker-Glandon contract and their $50,000 (checks for $45,000 and a demand note for $5,000). The lodge accepted the Becker-Glandon money and executed a sale contract with them. The following day the broker returned the K V deposit and that group's checks which had been given to him. K V filed this suit the next day. In an amended petition filed later it named the officers of the lodge as defendants also and alleged that a conspiracy to breach the contract existed among all defendants. At pretrial conference it was stipulated there was no evidence of conspiracy between the broker and the lodge and that issue was removed from the case. During trial at the conclusion of its evidence K V dismissed its claim against the individual lodge officers. After submission of the case and while the trial judge still had it under consideration K V deposited with the court clerk the sum of $81,000, the amount of the down payment called for by the January 16, 1970, contract.

The trial court entered a lengthy memorandum embodying many of the factual findings already related as well as its conclusions, and including the following:

"6. The court further finds that as a real estate broker, the defendant, Leonard Childers, had no authority to bind the defendant Lodge without its written acceptance to any contract differing in terms from the contract of January 16, 1970, and as extended May 6, 1970, to June 20, 1970; that in compliance with the provisions of the contract, the defendant Lodge did deliver an abstract of title to the property in question to broker, Childers, who in turn delivered it to Chadborn Abstract Company in February, 1970; that as of June 20, 1970, plaintiff had raised no question as to merchantability of title.

"7. That at the request of plaintiff K V Homes, Inc., said contract, dated January 16, 1970, bearing an expiration date of May 6, 1970, was extended to June 20, 1970.

"8. That said extension merely extended the expiration date and left all

other portions of the original contract dated January 16, 1970, in force and effect.

"9. That the contract dated January 16, 1970, and extended to June 20, 1970, contained, among other things, the following provisions:

"A. $10,000.00 to be paid by K V Homes, Inc., at the signing of the contract.

"B. That on or before June 20, 1970, the sum of $361,000.00 was to be paid as follows: $71,000.00 cash and a first mortgage in favor of sellers in the amount of $290,000 to be executed by K V Homes, Inc.

"C. That the entire contract was contingent upon approval of the property for residential development by the Federal Housing Administration and upon the ability of the purchasers to obtain necessary financing. In the event approval of the Federal Housing Administration and commitment for necessary financing could not be obtained on or before June 20, 1970, the contract shall become null and void and the deposit of $10,000.00 shall be returned to the purchaser.

"10. That on June 20, 1970, $71,000.00 was not tendered to the defendant Lodge or its broker, Leonard Childers; that the plaintiff, K V Homes, Inc., did not have $71,000.00 in its bank accounts or credits on June 20, 1970; that the Federal Housing Administration's approval of the property in question for residential development had not been obtained; that K V Homes, Inc., did not, on June 20, 1970, have a commitment for the necessary finanincing.

"11. Prior to June 20, 1970, the defendant Lodge did not grant any further extensions to plaintiff, K V Homes, Inc.

"12. The court finds that as of June 20, 1970, the contract dated January 16, 1970, and extended May 6, 1970, terminated as between the plaintiff, K V Homes, Inc., and the defendant, Wyandotte Lodge No. 3.

"13. The court further finds that in compliance with the terms of the contract, it being null and void, the original $10,000.00 paid by K V Homes; Inc., to Leonard Childers, was returned by Leonard Childers to K V Homes, Inc., and accepted by it.

"14. That during the week of June 15, 1970, plaintiff, K V Homes, Inc., requested defendant Childers to obtain modification of the contract of January 16, 1970, as extended to May 6, with reference to the amount of the original payment and a longer period to pay the balance of the purchase price. That defendant Childers contacted Mr. Rumford, Master of the Lodge, on June 18th, transmitting the K V Homes, Inc., request for modification, and that Mr. Rumford forthwith advised Mr. Childers that the Lodge might be agreeable to such modifications, but that if other terms were agreeable and if the contract was performed by June 20, 1970.

"15. The court further finds that on June 18, 1970, K V Homes, Inc., by and through Mr. Vineyard and Mr. Kaul, tendered a new contract to certain members of the Board of Trustees of the defendant Wyandotte Lodge No. 3 for its consideration, through Leonard Childers, broker, wherein only the amount of downpayment, $50,000.00, and none of the installment payments of the remaining balance of the purchase price were changed, this contract being subject to the acceptance by sellers; and all other terms of the January 16, 1970, contract remaining the same.

"16. That on June 19, 1970, said contract was returned unsigned to the

plaintiff corporation, whereupon Mr. Vineyard made changes A and B to said contract, thereby changing it again.

"17. The court further finds that on June 20, 1970, Leonard Childers, broker, met with Mr. Vineyard and Mr. Kaul, acting in their own individual capacities, as opposed to stockholders or directors of the plaintiff corporation, K V Homes, Inc.

"18. That on June 20, 1970, at the request of Mr. Vineyard and Mr. Kaul, Leonard Childers arranged for Hylton Harman and Joe Jenkins, II, to be present at a meeting with Mr. Vineyard and Mr. Kaul and certain other individuals to arrange for the raising of $50,000.00, and a new contract to be submitted to the defendant Wyandotte Lodge No. 3; that on June 20, 1970, Mr. Childers became a proposed purchaser and was given and accepted the sum of $30,000.00, together with a contract signed by K V Homes, Inc., said contract drawn and subject to acceptance by the seller, Wyandotte Lodge No. 3, defendant.

. . . . . . . . . . . . . . .

"22. The defendant Lodge did not at any time on or before June 20, 1970, commit any act to lead or cause the plaintiff K V Homes, Inc., or any of the other parties hereto to believe the contract of January 16, 1970, as extended May 6, 1970, would be extended further."

The court concluded the January 16, 1970, contract as modified and extended May 6, 1970, expired on June 20, 1970, without K V having carried out its obligations, and specific performance of that contract was denied. Damages against the lodge or the broker were likewise denied. The court ordered enforcement of the lodge's June 22, 1970, contract with Becker and Glandon and payment to the broker of a realtor's commission on that sale.

On appeal K V presents several contentions including alleged trial errors which need be noticed only briefly because of our view this is essentially a fact case on issues determinative of its disposition. The trial court excluded a letter offered in evidence by K V. This letter was a title report concerning the property which had been addressed to it by a title examiner for the abstract company. The letter requested that evidence be furnished of the authority of the lodge's officers to convey the property. This offer was excluded by the trial court, and we believe properly so, on the ground failure to furnish evidence of marketable title had never been raised as an issue either by the pleadings or at pretrial conference as a reason for K V's nonperformance under its contract. Likewise, we think the trial court did not act improperly in excluding evidence offered by K V to the effect that Mr. Vineyard would have invested sufficient funds to allow K V to comply completely with the down payments described in the contract if it had been requested by the lodge. There was testimony by the broker and by five members

of the lodge (master, secretary and three trustees) that contract performance in any event was to be by June 20th.

K V strenuously contends the provision in the contract making it contingent upon approval of the property for residential development was solely for its benefit and it was at liberty to waive that benefit. It might be arguable that the lodge as well had an interest in the proviso inasmuch as the contract called for substantial payments to be made to it the next four years and without FHA approval for housing development such payments might not be realizable from the security. In any event we think this and the other contentions raised on appeal are subordinate to undisputed facts which are dispositive of the case.

To be borne in mind is the fact that this is a suit by the corporate entity for specific performance of the January 16, 1970, contract as modified May 6, 1970, and extended to June 20, 1970. This was the only contract K V ever had with the lodge. What appears to be undisputed from the evidence is that commencing the week of June 15th K V abandoned this contract and its two stockholders commenced promotion of a new venture which culminated in the subscription agreement made June 20th by and between eight individuals, none of whom is a party in this suit. Assignment of the K V contract was contemplated; however, the new venture was based upon a new proposal to be offered the lodge, which proposal was never accepted by the lodge. Two new contracts were in fact prepared at K V's request embodying modified terms—each was drawn "subject to acceptance by seller" but neither was ever accepted. The trial court in effect found that K V had abandoned the January 16th contract and K V's own evidence evinces this fact.

K V's contention of estoppel on the part of the lodge is without merit. The lodge never deviated from insistence on performance by June 20th and it did nothing to prevent that performance. Beyond this, the authority of a real estate broker is limited. In *Sullivant v. Jahren*, 71 Kan. 127, 79 Pac. 1071, this court held:

"A real-estate broker or agent is one who negotiates sales of real estate. His business generally is to find a purchaser who is willing to buy on the terms fixed by the owner; that is, to bring the owner and a purchaser together. He has no implied authority to bind the principal by signing a contract of sale. Nor has he such authority to fix terms of sale, time of possession, or the covenants to be contained in the deed. Nor can he materially change the terms of sale fixed by the principal, without the latter's consent. He is a

special agent, and must pursue his instructions and act within the scope of his limited powers; and those who deal with him, if he exceed his authority, do so at their peril." (Syl. ¶ 1.)

K V could in no event rely on anything which was in fact beyond the authority of the broker.

We have considered other matters raised by appellant but find nothing to warrant disturbing the trial court's judgment and it is affirmed.

APPROVED BY THE COURT.

KAUL, J., not participating.