ARCHY BROWN V. JOB GILPIN.

No. 15,045   (90 Pac. 267.)

SYLLABUS BY THE COURT.

1. CONSTITUTIONAL LAW—*Stranger to a Contract May Not Assert that a New Law Impairs Its Obligation.* A would-be buyer of a tract of land who, after the statute of frauds had been amended so as to require, written authority for one to sign the name of another to a real-estate contract, entered into a written agreement for its purchase, which was executed for the owner by an agent whose authority had been granted by parol before the enactment of such amendment, cannot in an action for the specific performance of such agreement question the constitutionality of the new law as applied thereto on the ground that it impaired the obligation of an existing contract between the owner and his agent relating to such agency.

2. CONTRACTS—*Sale of Real Estate—Authority of Agent.* Com-

munications from the owner to a real-estate broker with respect to the sale of lands will be regarded as giving the agent only the authority usually incident to his employment—that is to say, to find a purchaser—unless a different intention is clearly shown, and no wider power than that is necessarily indicated by the use of the words "to sell" or "to make a sale" in describing the purpose for which the agent's services are engaged, inasmuch as in common parlance "to sell" is often used as meaning to negotiate or arrange for a sale, and a sale is spoken of as made when its terms have been orally agreed upon.

3. ——— *Agent Not Authorized to Execute a Written Contract.* A real-estate agent wrote to a landowner saying that he believed he could sell his land and asking its price. The owner answered stating price and terms, and asking him to show it to would-be purchasers and explain to them its advantages. The agent reported that he had an offer at a different price. The owner replied that he had come to a conclusion, if the agent would wait for his commission, and added "then make deed and send to be signed," stating how he wished the payments made. *Held,* that this correspondence did not result in a grant of power to the agent to bind his principal by a written contract for the sale of the land.

Error from McPherson district court; PETER J. GALLE, judge. Opinion filed May 11, 1907. Affirmed.

*Frank O. Johnson,* for plaintiff in error.

*Grattan & Grattan,* and *John D. Milliken,* for defendant in error.

The opinion of the court was delivered by

MASON, J.: Archie Brown brought a suit against Job Gilpin to compel the specific performance of a written contract for the sale of real estate, and failing to recover, the trial court having sustained a demurrer to his evidence, prosecutes error. The case involves the statute of frauds, and turns upon the question whether J. W. Wright, a real-estate agent, who executed the contract in behalf of Gilpin, had authority to do so.

Under the law of this state as it existed before March 21, 1905, an agency to execute a written contract for the sale of lands could be created by parol. (*Rottman*

*v. Wasson,* 5 Kan. 552.) Then by an amendment of the statute of frauds it was provided that this could only be done in writing. (Laws 1905, ch. 266, § 1.) The plaintiff claims that there was evidence that prior to that date Gilpin had orally given Wright authority to sign for him a contract for the sale of the land in question. On April 1, 1905, Wright did execute in Gilpin's behalf a contract for the sale of the land to Brown. Brown contends that Wright's parol authority was based on contract and could not be abrogated or affected by an act of the legislature. Whether or not Wright could avoid the force of the statute upon the theory that it impaired the obligation of an existing contract, Brown certainly cannot do so, for he was not a party to any agreement made before the act was passed.

"Not only must the party attacking the validity of a statute on the ground that it impairs the obligation of the contract be able to show that he has been injured by the infraction, but he must be a party to the contract the obligation of which he alleges to be impaired or he will not be heard to complain." (8 Cyc. 789.)

The serious question to be determined is whether Wright had written authority to execute the contract for Gilpin. If so, it resulted from the following correspondence:

*(Wright to Gilpin, February 25, 1905.)*

"You told me when you left Kansas that you wanted to sell your land at Windom. What is the least price you will take for the 240 acres of pasture and the Kerm 40 by itself; the northeast quarter of 17 by itself? That is, price it separately; also price it all in a body of 440 acres. I have an inquiry for something about like this and in case price is right believe I can sell it for cash. Let me hear from you promptly and make your price and terms plain so I can do business without waiting to write you again. In case of sale, can you give possession this spring? Now get a move on and lets do business. I want to make you some money so you can live in sunny California."

*(Gilpin to Wright, March 5, 1905.)*

"Yours O. B. & O. K. epistle is rec. and contents noted. . . . Now about the 440 acres total, I want $9000, and $5000 for the northeast of seventeen, and $600 for the 40 in nine. This would be without any commish attached on my part. I consider the way it is located and watered it is reasonable and the way land has advanced the last few years and the way the rent has paid me. Now, if you have your man spotted, it would be well enough to go with him yourself and look at all the advantages and disadvantages, then strike your diaden [bargain?] and you can insure running water on all the pasture land the year around. No shortage as long as it can be used; possession at any time. This would leave 240 acres to itself and I will not give you price on that until I hear from you again. It is a good money maker and not much expense. The 40 in nine should go with the cultivated quarter, as there is not grass sufficient to do without hiring pasture. Or you can throw in the southwest of seventeen, call it $4000."

*(Wright to Gilpin, March 23, 1905.)*

"I have offer to-day of $13 per acre straight through in cash for your three eighties of pasture and the forty acres right east of the pasture, in all 280 acres. Let me know by return mail if this will buy it and give possession on this spring. Party may want the northeast of seventeen later on. In case this offer will not buy it, let me know your least cash price and include my commission in your price."

*(Gilpin to Wright, April 2, 1905.)*

"Allow me to answer yours of last week and excuse the card as I have not time to write more. If convenient should like to retain the forty in nine to go with the northeast of seventeen, as there is but little pasture on that quarter. The 240 together the way it is located and watered is worth $16 an acre with your commission included if not too much; without crowding the pasture it will average me $1 an acre without very little expense. This would be possession this spring or the price of the pasture less next fall."

*(Wright to Gilpin, April 11, 1905.)*

"I could not sell your pasture 240 acres for the price $16 an acre. You are too high the way pasture land is selling. I have an offer to-day of $7000 for the 240

acres and the 40 and the northeast quarter of seventeen, in all 440 acres; can get all cash in case you want it. If not let me hear from you right quick as it is getting late and pasture lands are not selling readily. Cattle prices have been so low that some have quit the cattle business entirely. Lots of people are going further west to buy land. $7000 for the above land will make you quite a little bit of money above what you paid for it. Don't you think you had better sell?"

*(Gilpin to Wright, April 16, 1905.)*

"Yours just received. In reply would say there were no specifications except an unconditional surrender after meditating and premeditating I have come to a final conclusion if you can wait until I return in June for your commish or send a note for 60 days or 90 days at 10 per cent. for I have to use what is left here at three times that amount of int. Speculation is running high here since the cold winter. Then make deed and send to be signed. . . . Now John I suppose you are trading with Parker the way the price is. Remember in the last few years I have paid you several $100 in trading and be reasonable with. Send me word if you can wait three months and I will pay your note at the Merchant's bank. I want the $1000 mortgage paid and $4000 to L. C. Gilpin and $2000 sent here. Send your price if you don't send a note. Money for short time is 24 per cent., but I want to pay that amount on lots. . . . What about the crop for this year?"

At this stage of the proceedings the contract in question was executed, reading as follows:

"KNOW ALL MEN BY THESE PRESENTS: That J. W. Wright, agent, in consideration of the sum of seven thousand dollars, of which sum five hundred have been paid, the receipt whereof is hereby acknowledged, agrees to sell to Archy Brown, of McPherson county, state of Kansas, the following described real estate, situated in McPherson county, state of Kansas, to wit:

"The south half, northeast quarter, and the southeast quarter, section eight (8), the northwest quarter of southwest quarter, section nine (9), and the northeast quarter of section 17, all in township 19, range 5 west.

"The said J. W. Wright, agent, agrees to deliver to said Archy Brown or his assigns a good and sufficient

warranty deed for the above-described real estate, provided and upon the condition that the said Archy Brown or his assigns shall pay the further sum of six thousand five hundred dollars, according to the terms and conditions following: Cash on delivery of deed and abstract showing clear title.

"Abstract shall be furnished showing clear title in grantor.

"Any improvements on the farm belonging to tenant are reserved. Possession shall be given according to terms of lease with present tenant.

"Party of second part agrees to pay said J. W. Wright $100 commission within sixty days from this date in case this sale is closed.

"Witness our hands at McPherson, Kan., this 21st day of April, A. D. 1905. J. W. WRIGHT.
ARCHY BROWN."

On the same day Wright wrote to Gilpin:

"Your letter at hand yesterday morning. I saw my man and to-day have contracted the sale of your land to him at $7000. He will pay $6000 cash and assume the payment of the $1000 mortgage on the southeast ¼ of section 8, which is the same as cash to you. I have prepared the deed as you requested and send it in this letter. Where are your deeds and abstracts? We must have them before a clear title can be made. As to the rents: Of course, Mr. Brown will want the rents from the land this summer and will want the lease turned over to him. He don't want possession of the land this spring. He would not buy and get nothing from the land this season no sooner than we would. Now as to my commission. I don't like to make any cut on my regular commission, but I will do so in your case. The regular commission would be $200. I will cut this right in two and make it $100, and send note for you to sign as requested in your letter."

On April 22 Gilpin mailed a postal card to Wright, reading:

"Wait a few days on our deal until I write you again. I want the children to know about the deal first. Will write again."

The correspondence was closed by this letter from Gilpin to Wright, written April 25, 1905:

"Your deeds arrived last night; I had given up sign-

ing same when I sent you the card of which it seems you had not received. When I accepted of the bid I was bad sick at hospital and the way my business was left it seemed as I must do something soon, consequently did n't wait the sale but sent to city and had a will executed and is there in deposit which suits me much better than the sale. I was taken with stomach trouble and heart failure; hired a hand to do my duty had you mentioned your customers name, I should· at once told· you the deal was off. That man could never buy a foot of land high or low from me. The papers will be destroyed here to save postage in returning. Your description of mortgage is wrong. It is on the 40 and 80 but there is no part of it in the market from now on. I shall no doubt see you about harvest and satisfy you for your trouble."

·The provision of the contract that an abstract of title should be furnished to the buyer imposed upon the seller a condition clearly not covered by the letters, but as there was testimony that this was in accordance with a local custom, and the case was decided upon a demurrer to the evidence, this consideration may be disregarded. So may the absence from the contract of the name of Wright's principal, since this could probably be supplied from the other writings. There may be room for doubt as to what disposition of the rent for the current season the contract contemplated, and perhaps with respect to other matters, but Gilpin made no point upon any such ambiguity. The letters show that Gilpin made Wright his agent for some purpose with respect to the sale of the land; that Wright communicated to Gilpin an offer he had received covering all the matters essential to a bargain, and Gilpin indicated that it was satisfactory to him. The terms of such offer were the same, or may be assumed to have been the same, as those of the contract which Wright executed. If Wright had power to bind Gilpin at all in the matter he had authority to execute the very contract which he in fact signed. The case therefore turns squarely upon whether the making of a written agreement for the sale of the land was within the scope of Wright's employment.

There is much apparent and some real conflict in the decisions in similar cases. It is well settled that one employed to find a buyer of real estate has no implied authority to execute a contract of sale in behalf of his employer. (19 Cyc. 295.) And it is probably beyond dispute that the ordinary transaction by which land is said to be "listed" with an agent—that is, where an owner informs a real-estate broker of his wish to sell property upon stated terms and invokes his professional services in that respect—does not imply any grant of power to execute a contract for its sale.

"His authority is limited to the power of finding a purchaser satisfactory to the principal, in the absence of a stipulation, express or implied, to the contrary." (19 Cyc. 295.)

"A real-estate broker or agent is one who negotiates the sales of real property. His business, generally speaking, is only to find a purchaser who is willing to buy the land upon the terms fixed by the owner. He has no authority to bind the principal by signing a contract of sale." (*McCullough v. Hitchcock,* 71 Conn. 401, 404, 42 Atl. 81.)

So far there is no want of harmony in the adjudications. There is a seeming disagreement, however, upon the question whether authority granted to an agent to sell real estate confers upon him the power to bind his principal by a written contract, as is illustrated by the following extracts from the opinions in the cases named, the first four affirming, the others apparently denying, the proposition:

"The defendant's counsel went so far as to contend that an agent for sale has not authority to sign a contract unless express authority to sign a contract, as distinguished from authority to sell, is proved. In my opinion, this is not the law." (*Rosenbaum v. Belson,* [1900] 2 Ch. 267, 268, 82 L. T. Rep., n. s., 658.)

"Authority from Dodge to Iglehart to sell the land included the necessary and usual means to make a binding contract in the name of the principal. If the authority to sell may be created by parol, from this authority may be implied the power to use the ordinary

and usual means of effecting a valid sale; and to make such sale it was necessary to make a writing evidencing the same." (*Johnson v. Dodge,* 17 Ill. 433, 441.)

"Although the authority conferred by the defendant by letter upon Messrs. Cochran, Rice & Walsh to 'sell' the land was insufficient to empower them to convey, it authorized them, as his agents, to make an executory contract to sell, upon the terms stated therein." (*Jackson v. Badger,* 35 Minn. 52, 53, 26 N. W. 908.)

"An agent authorized to sell either real or personal estate may enter into a contract, within the terms of his authority, which will bind his principal. This is of the very essence of the authority given, viz., an authority to sell. That he can bind his principal by a formal contract is the doctrine of the books from the earliest law on the subject." (*Haydock v. Stow,* 40 N. Y. 363, 368.)

"Unless express authority is given to the agent to sell, and for that purpose to enter into a binding contract, the principal reserves his final right to accept or refuse." (*Chadburn v. Moore,* 61 L. J. Rep., n. s., [Eng. Ch.,] 674, 676.)

"Giving authority to sell does not, by force of the terms, or by their general acceptation, give authority to sign the vendor's name to a contract. And in case of lands it is not wise to extend this meaning by construction." (*Morris v. Ruddy,* 20 N. J. Eq. 236, 238.)

"We are of opinion that the authority given to Atkins to sell the property was not sufficient to authorize him to execute a contract of sale to Duffy, in the name of Hobson, or to sign the name of the latter to any contract of sale." (*Duffy v. Hobson,* 40 Cal. 240, 244, 6 Am. Rep. 617.)

"Authority granted to an agent to sell real estate does not give authority to enter into a contract for a conveyance. When the agent procures a purchaser, ready, willing and able to buy on the terms proposed, his employment is at an end." (*Armstrong v. Oakley,* 23 Wash. 122, 124, 62 Pac. 499. See, also, 1 A. & E. Encycl. of L. 1011, note 1; 2 Clark & Skyles, Law of Agency, § 799.)

The real controversy, however, is not whether the actual grant of an authority to sell gives the agent

power to execute a contract of sale; it is as to what form of expression will be deemed to establish an agency to sell. Most of the cases that seem to deny that power to contract follows from authority to sell in fact go no further than this: that communications from the owner to a real-estate broker with respect to the sale of lands will be regarded as giving the agent only the authority usually incident to his employment— that is, to find a purchaser—unless a different intention is clearly shown; and that no wider power than that is necessarily indicated by the use of the words "to sell" or "to make a sale" in describing the purpose for which the agent's services are engaged, inasmuch as in common parlance "to sell" is often used as meaning to negotiate or arrange for a sale and a sale is said to be made when its terms have been orally agreed upon. The rule is thus stated, after a review of the earlier decisions, in *Keim v. Lindley,* (N. J. Eq.) 30 Atl. 1063, 1073:

"The mere employment of an ordinary real-estate broker to effect a sale of a parcel of land, even though the price and terms be prescribed, does not amount to giving present authority to such broker to conclude a binding contract for the same. Moreover, such authority is not usually to be inferred from the use by the principal and broker in that connection of the terms 'for sale' or 'to sell' and the like. Those words in that connection usually mean no more than to negotiate a sale by finding a purchaser upon satisfactory terms."

This language is approved on review in *Lindley et al. v. Keim et al.,* 54 N. J. Eq. 418, 34 Atl. 1073, 1075, the court adding:

"He who seeks to establish the authority of an agent to bind his principal to the sale and conveyance of lands by proof of circumstances from which it may be inferred that such authority was granted will not be successful if the circumstances proved merely justify the inference that the principal had placed his lands in the hands of the agent as an ordinary real-estate broker." (Page 423.)

That the word "sell" may be interpreted according to

the circumstances of the case is recognized in *Rosenbaum v. Belson,* (1900) 2 Ch. 267, 82 L. T. Rep., n. s., 658, by the use of this language, following that already quoted:

"The authority in the present case is in the terms: 'Please sell for me my houses, and I agree to pay you a commission on the purchase-price accepted.' This is an authority to sell. A sale *prima facie* means a sale effectual in point of law, including the execution of a contract where the law requires a contract in writing. I do not find anything in the circumstances of this case which induces me to say that the word 'sell' here means less than this." (Page 269.)

The inquiry to be determined in each doubtful case is whether the owner has shown an intention that his agent should merely act as an ordinary broker or that he should go further and actually effect a binding contract of sale. The great weight of authority is that the latter intention will not be inferred except from the use of unequivocal expressions to that effect, and that the terms "sell" and "sale" are not of that character. It is true that in some of the cases which announce this view the result reached was compelled by the circumstance that the instructions to the agent did not cover all the details necessary to the completion of a bargain, or, if they did, that the contract made did not conform thereto, but the conclusions are supported by reasoning independent of this consideration; and leaving these cases out of account there still remain abundant instances in which communications more nearly approaching positive directions to complete a sale than those here disclosed have been interpreted as creating no power beyond that of finding a purchaser. The following are examples of some of the instructions so interpreted:

In *Carstens v. McReavy,* 1 Wash. 359, 25 Pac. 471, the trial court found as a fact that the persons who executed the contract "were the agents of defendant [the owner] for the sale of the aforesaid real estate, and were then and there duly authorized and em-

powered by the defendant, by writing under the defendant's hand, to make and negotiate a sale of said real estate." (Page 361.) Although the language to be interpreted was that of the court instead of the parties, it was held on review that the agents had no authority to execute a contract of sale. This case, however, is an extreme one, and approves *Coleman v. Garrigues*, 18 Barb. (N. Y.) 60 (where the agent was authorized to "close the bargain"), notwithstanding its having been overruled by *Haydock v. Stow*, 40 N. Y. 363.

In *Grant v. Ede*, 85 Cal. 418, 24 Pac. 890, 20 Am. St. Rep. 237, the principals wrote: "as you stated you could get $30,000 for the place you occupy, . . . and if you can, we will sell at that price . . . and allow you 2½ per cent. on said price." (Page 419.) It was held that this gave authority only to find a purchaser.

In *Donnan v. Adams*, 30 Tex. Civ. App. 615, 71 S. W. 580, the findings showed that the owner, Adams, had "requested Walsh [the agent] to sell the land at $3 per acre, and stated that he hoped he (Walsh) could make a sale of it, as he had done considerable business for him (Adams), for which he had received no pay, and he would like for Walsh to make the commission." (Page 615.) The supreme court affirmed a judgment against the right of the agent to execute a contract of sale.

In *Larson v. O'Hara*, 98 Minn. 71, 107 N. W. 821, the owner wrote to the agents "stating that she would accept $3800 net cash for the land in question, provided they could sell it by January 1, 1905. On January 25, 1905, evidently in reply to an offer, she again wrote to them that she would accept $3675 for the land and allow them a commission of $80 for making the sale. On January 30, 1905, she wrote again, suggesting or agreeing to some modifications in the terms of payment. On January 31 the brokers telegraphed her: 'Letter received. Party accepts your offer. All cash. See letter.'" (Page 72.) The court said:

"Upon this evidence we are satisfied that Mrs.

·O'Hara [the owner] never authorized the brokers to execute a contract for the sale of the land. Their authority was limited to finding a purchaser who was willing to buy on the terms fixed by the owner." (Page 73.)

In *Brandrup v. Britten*, 11 N. Dak. 376, 92 N. W. 453, the agents were given an instrument reading:

"I hereby grant to H. B. Meis and Orcutt the sale of the following-described property for six months at the price and upon the terms below mentioned, with the express understanding that the said H. B. Meis shall use all diligence and make active and strong efforts to sell said property. . . . Price, net to me, $9000, not less than $3000 cash, and assume mortgage now on land." (Page 376.)

The court said:

"It is not contended that Meis & Orcutt had any further authority to sign the defendant's name to the contract in question than was given by the listing contract hereinbefore set out. Does this writing confer such authority? We are clear that it does not. It will be seen upon inspection that it contains no language which, in terms or by fair inference, authorizes the real-estate brokers therein named to execute contracts or conveyances on behalf of their principal. It is patent that it confers upon them no further or greater authority than is commonly given to real-estate brokers with whom land is listed for sale. And it is well settled that the agency of such persons is limited to finding purchasers who are acceptable to vendors, or who are prepared to comply with the conditions of sale proposed by the vendors to their brokers, and, in the absence of express authority, does not extend to signing contracts of sale or conveyances on behalf of their principal." (Page 378.)

In the present case Gilpin nowhere expressly authorized Wright to sign a contract for him, and it is evident from his letters that it never occurred to him that such a thing was necessary or desirable. He did not even refer in terms to Wright's selling or making a sale of his property. Wright said in his first letter "I can sell it for cash," and later "I could not sell your

50—75 KAN.

pasture 240 acres for the price, $16 an acre," but these expressions were such as would naturally be used by a broker authorized only to negotiate a sale. There is nothing in the correspondence inconsistent with the theory that it was understood on both sides that Wright was employed to perform such services as are ordinarily rendered by a real-estate agent in behalf of one seeking to sell land. We think the trial court rightly sustained the demurrer.

It is urged that this conclusion is opposed by *Rottman v. Wasson*, 5 Kan. 552, and by *Johnson v. Furnish*, 29 Kan. 523. In the former case it was found as a fact that oral authority had been given an agent "to sell" land, and this was held sufficient to enable him to execute a contract of sale. The only question discussed was whether such power could be conferred otherwise than by writing. The decision is not in any view, however, in conflict with that reached here. In the latter case a contract for the sale of land was upheld although executed by an agent, but the sole question presented was whether the contract which he signed conformed to his instructions. In the brief which assailed it an explicit admission was made that he "had been authorized to make a sale of the land." On the other hand the view here announced was approved in *Sullivant v. Jahren*, 71 Kan. 127, 79 Pac. 1071, although there the contract was also found to be invalid because not in conformity with the terms fixed by the owner.

The contention is made that even if Wright had no power to execute a written contract the letters between him and Gilpin form a sufficient memorandum of an oral agreement upon which a conveyance can be enforced. It was held in *Singleton v. Hill, and others*, 91 Wis. 51, 64 N. W. 588, 51 Am. St. Rep. 868, that correspondence between the owner and his agent may constitute such a memorandum of a contract made by the latter as to satisfy the statute of frauds; but there it was admitted that the agent had actual authority to effect a sale. Where the agent's employment is only to

The State v. Leavenworth.

find a purchaser a contract entered into by him in excess of his authority can derive no validity from the fact that its terms are the same as those stated in writing by the principal. Moreover, no issue in this regard was presented by the pleadings. The plaintiff in beginning his suit saw fit to rely wholly upon the formal contract. The trial court rightly held that he could not recover upon that, and he made no effort to enlarge the scope of the inquiry by amending his petition.

The judgment is affirmed.