No. 25,542.

Frank Yates, *Appellant,* v. The Garden City Sugar and Land Company, The Garden City Company, and The Garden City Land and Immigration Company, *Appellees.*

SYLLABUS BY THE COURT.

Sale of Land—*Fraudulent Representations by Third Party—Whether Real-estate Agencies were Coconspirators with Third Party, Question of Fact for Jury.* In an action against a defendant land-owning corporation and a defendant land-selling corporation for the fraudulent conduct of a third party whose services had been procured to assist in the sale of defendant owner's lands, the evidence examined, and held insufficient to fasten liability on either of defendant corporations on the theory of agency, but held also that the evidence to fasten liability on either or both of defendant corporations as coconspirators of the third party wrongdoer was sufficient against a demurrer, and presented a fair question for a jury to decide.

Appeal from Finney district court; Charles E. Vance, judge. Opinion filed January 10, 1925. Reversed.

*William H. Thompson, Elbridge G. Wilson,* and *Wilbert F. Thompson,* all of Kansas City, for the appellant.

*William Easton Hutchison, C. R. Hope, A. M. Fleming,* all of Garden City, and *James H. Rothrock,* of Colorado Springs, Colo., for appellees The Garden City Sugar and Land Company, and The Garden City Company; *R. W. Hoskinson,* and *Robert S. Field,* both of Garden City, for appellee The Garden City Land and Immigration Company.

The opinion of the court was delivered by

Dawson, J.: The plaintiff was swindled out of twenty thousand dollars' worth of Liberty bonds by one Francis C. McCarty in a fraudulent sale of a quarter section of Finney county land, and sought to fasten liability therefor on the defendants as principals of McCarty or as his coconspirators. Demurrers to plaintiff's evidence were sustained, and he appeals.

To test the propriety of this disposition of the cause, the facts developed by the pleadings, the testimony and the documentary evi-

dence will need to be narrated at some length. It appears that in 1919 the Garden City Sugar and Land Company owned a large amount of land in Finney and other southwestern Kansas counties which it desired to sell. Accordingly it listed some 5,760 acres of these lands with one J. P. Nolan, giving him in writing an exclusive agency contract for eighteen months for their sale. Among these lands was the southwest quarter of section 19, township 22 south, range 33 west, involved in this action. On January 1, 1920, Nolan, with the consent of the sugar land company, assigned his agency contract rights to the Garden City Land and Immigration Company, a concern engaged in the real-estate business. This latter company entered into a new contract with the suger land company which superseded the Nolan contract. By its terms the sugar land company granted to the real estate selling company an exclusive agency contract for eighteen months to sell 5,440 acres of its lands, including the quarter section involved herein, upon a prescribed schedule of prices to net $67.4633 per acre to the owner, to which the selling company was to add and prorate to the selling price of all the lands so listed the sum of $17,800 as an approximate 5 per cent of selling commission, and upon prices so fixed the selling company had to procure buyers able to pay 25 per cent of the purchase price in cash on each tract sold, and the owner was to accept first mortgages as security for the remainder of the purchase price. The contract also contemplated that the real estate selling company might superimpose on the land prices so fixed an additional 10 per cent, which apparently it might keep as additional compensation. The sugar land company, as owner, agreed to execute deeds and furnish abstracts of title to individual tracts of land as they were sold by the selling company. In this contract, also, among other details, was a stipulation that J. P. Nolan, who had assigned his agency rights to the selling company, should receive a moiety of the gross selling prices, so that the average selling price per acre had to be fixed at $77.809 in order to give the owner its prescribed net price and to cover incidental expenses and commissions for Nolan and the selling company. The contract covered other details of no present concern. The scheduled list of lands and prices attached to this contract contained the following:

"Moon District.

"Southeast quarter section 19, township 22, range 33, one-half interest pumping plant, 160 acres. Nolan contract: $70.00, $11,200.00. January 1, 1920, classified or graded contract: $71.50, $11,440.00."

The Garden City Land and Immigration Company, the selling agent, enlisted the assistance of some Kansas City real-estate dealers, styled the Fidelity Farm Lands Company and the Alfalfa Lands Company, to sell the sugar land company's properties and other real estate; and one of these Kansas City firms began negotiations with Francis C. McCarty, of Chicago, to procure his assistance in selling the lands. McCarty was one of those modern land-boom promoters who organize and conduct railroad excursions of credulous people who have more money than wit, recruited from all sections of the country and escorted to distant localities and there duped—sometimes by playing on their cupidity, but frequently by downright fraudulent misrepresentations—into buying lands they have no use for at five, ten, or twenty times their reasonable value. McCarty had a numerous organization of real-estate dealers located in various towns throughout the middle west whose business it was to select people of means who might be induced to join one of McCarty's excursions and who were likely dupes for McCarty's land-selling schemes. A contract was made between the Garden City Land and Immigration Company, which was the original land-selling company and assignee of Nolan, the Fidelity Farm Lands Company and the Alfalfa Lands Company, which were the Kansas City real-estate agencies, and Francis C. McCarty whereby the contracting parties were to share the benefits of the exclusive selling agency granted by the land-owning company. It was also agreed as to whatever lands McCarty should sell, that an additional 20 per cent of the net cost (the owner's price) should be added to the selling price and the resulting profit should be prorated, 5 per cent to the Garden City Land and Immigration Company, 5 per cent to the Fidelity Farm Lands Company, and 10 per cent to the Alfalfa Lands Company. The contract also provided for a trustee with whom conveyances should intermediately be deposited for delivery on the payment of the cash and notes and security required to satisfy the owner's selling price plus the commission and added percentages imposed by the several parties participating in the sale of the lands. It was also agreed that McCarty might sell the lands at whatever prices and terms he saw fit and that deeds would be forthcoming through the trustee on McCarty's demand so that title might eventually vest in McCarty's customers. On this point the contract reads:

"Said lands shall move to Mr. McCarty at owner's net cost as defined in paragraph III, plus 20 per cent thereof, and in addition thereto, accumulating

interest and taxes. . . . Mr. McCarty is at liberty to resell said lands in any subdivisional portion thereof, suited to his interest, at such price and upon such terms as dictated by him, provided that in any event Mr. McCarty must pay an amount in cash and notes to the trustee to equal the amount passing to the owner plus the 20 per cent as defined in paragraph III; and

"(1) Mr. McCarty will make sales in his own name upon blanks prepared by him and all earnest money and notes taken in his name.

"(2) As contracts of resale are made by Mr. McCarty, an original copy thereof shall be immediately forwarded to the trustee, together with draft for one-fourth of all such sums received by him, until a sufficient amount of each resale shall be deposited with the trustee as will equal the amount necessary to lift deed, plus the sums mentioned in paragraphs III and XVIII.

"(3) Mr. McCarty will pay all solicitor's commissions and be alone responsible therefor, plus all of his office and excursion expenses and the expense of showing land.

"(4) . . .

"(*a*) Upon the demand of the trustee, the companies will cause deeds, abstracts, notes and mortgages to be forwarded to any bank designated by him, with instructions to deliver to the trustee or Mr. McCarty such deeds, abstracts and papers, upon payment by the trustee or Mr. McCarty to the bank to which such papers are sent the landowner's cash payment, the Garden City Land and Immigration Company's cash payment, the notes moving to the landowner, if any, and the notes moving to the Garden City Land and Immigration Company.

"(*b*) The companies will not be responsible for failure to deliver title to any land where they undertake and actually tender such title and interest of their vendors as they receive or obtain; however, in any case when merchantable title can not be obtained to any land resold by Mr. McCarty, then it is at the option of Mr. McCarty whether he will accept such title as attainable.

"X. So long as Mr. McCarty abides by the terms of the agreement, he is hereby vested with an equitable interest in all options and sales contracts on land now held, or hereafter acquired by the companies, in the territory allotted to Mr. McCarty, and the trustee will recognize Mr. McCarty as having an equitable interest in all such contracts and options;' it being intended that in case the companies fail or refuse to aid or assist in obtaining titles to land sold by Mr. McCarty, he shall have the right to obtain deeds from the owners direct upon paying therefor the cost sum demanded for deeds as may be provided in any option or sales contract, plus sums provided in paragraphs III and XVII. . . .

"XII. . . . (*c*) Where Mr. McCarty sells a portion of land held under contract or option which requires the company to take title to the entire tract or body, then where Mr. McCarty splits any such tract, he shall be required to take title to the whole body in accordance with the terms of the company's contract or option with the real owner. . . .

"GENERAL PROVISIONS.

"Mr. McCarty is entitled to the services of either Mr. Quimby or Mr. Couch or Mr. Hawthorne [persons connected with the Kansas City real-estate agencies] in riding excursion trains and assisting in making sales, and on all

Yates v. Sugar and Land Co. *et al.*

lands sold in which either of said parties ride a train and assist in making sales, three per cent of the retail price of all lands resold by Mr. McCarty shall be paid the gentleman named; provided, that Mr. Hawthorne has the right to ride any and all trains and be entitled to the 3 per cent commission, and said 3 per cent to be paid as follows: 3 per cent of the cash received by Mr. McCarty on each resale to be paid the trustee as and when received, and by the trustee immediately paid to Messrs. Quimby, Couch and Hawthorne, until one-half of the cash consideration in each resale has been paid Mr. Mc-Carty, when the full amount of said 3 per cent shall be paid to the trustee and by him forthwith disbursed.  .  .  .

"The trustee's fees shall be divided: (*a*) One-third by the Fidelity Farm Lands Company; (*b*) one-third Alfalfa Lands Company, and (*c*) one-third by Mr. McCarty."

Pursuant to these complicated arrangements, McCarty brought a large number of his subagents to Finney county in the early weeks of 1920 to see the properties to be sold, so that they might intelligently describe the lands to their prospective customers; and not long afterwards McCarty began to bring in trainloads of people to view the lands. He usually ran two or three excursion trains per month. He charged the excursionists a relatively small sum ($35) for plaintiff and wife, from Rantoul, Ill., to Colorado Springs and return, with stopover at Garden City. Plaintiff was induced to join one of McCarty's excursions by one Morrow, a "district agent" of McCarty, and by one Wheeler, McCarty's "local agent" in plaintiff's home town. Plaintiff's testimony reads:

"We left on May 22 and made the trip on one of McCarty's trains. We arrived in Garden City on the morning of May 24th, and were taken in automobiles over the country. . . . Speeches were made at each place, in which representations as to fertility and productivity of the soil were made; in substance, that 32 tons of beets per acre, 10 or 12 tons of alfalfa, that is, five to six cuttings, averaging 2 to 2½ tons per acre, could be raised per season. In regard to this particular quarter section of land, it was represented to us that this land had the best well in the county on it, which would pump 5,000 gallons a minute, and that the total cost of irrigation per season would be $1 an acre. It was also said that a railroad would soon be built, with a station just one-half mile east of this farm.

"We were taken to Colorado Springs, where we went through the Garden of the Gods and were banqueted at the Broadmore hotel, after which we returned to Garden City. . . .

"Q. What did you do about closing the deal that day? Did you come to any conclusion up there at the land? A. We had made up our mind up there that we would buy that. . . .

"Q. You went back to the train? A. Yes. . . .

"Q. What did they do with you there? A. We went into the compartment, Mrs. Yates and Mr. Wheeler and Mr. Fred B. Proctor.

"Q. Who was Mr. Proctor? A. He was agent of Mr. McCarty, and seemed to have the closing up of the contracts. I do not know what his official position is. . . .

"Q. What did he do, while you were eating your lunch? A. He had the contracts fixed up for us, at that time.

"Q. You relied on what Mr. Wheeler told you? A. Yes, sir.

"Q. You told him to put in the clause about having the crop? A. It seemed like that was all I wanted.

"Q. How much did you agree to pay for the land? A. Forty thousand dollars, twenty thousand dollars to be in Liberty bonds and the balance to be in five equal payments of four thousand dollars each year for five years, with interest at six per cent."

The contract between plaintiff and McCarty provided for the purchase of 160 acres of land (S. E. $\frac{1}{4}$ 19, 22, 23, Finney county) for $40,000, of which $20,000 was to be paid on demand and balance on terms. The contract provided that McCarty would "convey or cause to be conveyed" to plaintiff the land described. It also provided:

"This agreement is made subject to the approval of the owner of said land, and in the event of the disapproval hereof on the part of the owner, or in case 'The Company' [*i. e.*, McCarty] is unable for any reason to deliver deed to said land, then and in that event 'The Company' [*i. e.*, McCarty] shall have the right to cancel this contract upon returning to such purchaser the amount of money so paid hereunder by him, together with all notes executed by 'The Purchaser,' and thereupon 'The Company,' [*i. e.*, McCarty] and the owner shall be released and discharged from all liability and responsibility hereunder. . .

"Witness the hands and seals of the parties hereto this 27th day of May, 1920. Executed in duplicate.

"FRANCIS C. McCARTY LAND COMPANY,
"By F. B. PROCTOR.
"FRANK YATES."

McCarty's deposition was taken by plaintiff. He deposed:

"When we got there, the boys were turned loose in the town. At noon we were entertained by the local business organization of some kind, I think the Chamber of Commerce, and had dinner together. Then we turned the men loose in the town to investigate everything around the town. That night we took our crowd—we had our own cooks, porters and waiters—and with the assistance of some people from town, we gave the town people a banquet in the basement of a large church there, and at that time we had the citizens there tell our men how good the Garden City district was, what they could raise out there, the crops they could produce, the cost of irrigation, and all of those things. We were addressed by the banker, Mr. Low, an irrigation expert, and I think by a man who was attorney for the sugar company, living near there. . . .

"Well, the contract I made later on with the Garden City company; I think they were the owners of the land. . . .

"Q. What was the purpose of building a club house?  A. I wanted a club house for the purpose of having a large dining room.  We carried from 200 to 500 people on an excursion, and wanted a large dining room so we could feed the people all at one time.  By feeding the people in the dining cars or small dining room, it would take most of the day to feed the people, but by having one big dining room and a big kitchen we could feed the people in large quantities, and yet all at one and the same time.  . . .

"The club house was constructed entirely at my expense.  The purpose in the erection, maintenance and conduct of the club house was to keep our crowd together.  . . .

"Q. Now Mr. McCarty, on your trips to Garden City in the demonstration of these lands, the showing of these lands, what arrangements, if any, did you have with the Garden City Company, or The Garden City Sugar and Land Company, or The Garden City Development Company, as to furnishing assistance in showing the lands.  A. We were not to have any assistance from them at all in any way."

McCarty became dissatisfied with the contractual and operative arrangements between himself and his associates, and on June 22, 1920, he entered into a contract with the owners of the sugar lands. By that time the ownership had passed from the Garden City Sugar and Land Company to the Garden City Company, a Delaware corporation, and to certain citizens of Colorado Springs.  The latter contract gave McCarty an option, expiring March 1, 1921, to purchase a scheduled list of Finney county lands owned by them, or either of them, on terms specified in detail.  Whether such list contained the quarter section which was the subject of the fraudulent sale to plaintiff by McCarty executed May 27, 1920, is not disclosed, but that fact would be of little consequence since the contract which put McCarty directly in touch with the owners was executed subsequently to the transaction complained of by plaintiff.

There was some evidence tending to show that the managing officers of the corporate landowner knew in a general way about McCarty's excursion trains and heard some of the extravagant statements made to the excursionists by McCarty's subordinates as to the productivity and value of the lands and of the cost of irrigation. Whether it was shown that any of the misrepresentations of McCarty's subordinates to plaintiff were made in the presence of any officers or agents of either of the defendant appellees, is not clear. McCarty's club house was built on the corporate owner's land, with the latter's permission and without charge.  McCarty's excursion trains used the stub railway belonging to a corporation subsidiary to the corporate landowner.  That stub railway branched off from

the Santa Fe railway lines. McCarty, however, paid the regular charges for that railway service. It was also shown that the corporate landowner was accustomed to make deeds to whatever straw man was nominated by McCarty for use as a medium through whom title should pass to McCarty's undisclosed customers. It was also shown that the land purchased by plaintiff at $250 per acre was worth from $70 to $100 per acre. The falsity of the representations as to its productivity and cost of irrigation made to plaintiff by McCarty's subordinates, on which he relied and because of which he parted with his $20,000, was likewise proved.

Do all the foregoing matters, given their strongest possible significance in plaintiff's behalf, tend to fix responsibility on the Garden City Sugar and Land Company and its successor in ownership, the Garden City Company, or on the Garden City Land and Immigration Company, for the misdeeds of McCarty? Did the above evidence, with the inferences which were fairly deducible therefrom, establish McCarty's agency to receive plaintiff's $20,000 on behalf of either of these corporations? It is not contended, of course, that there was any vice in the agency contract given by the owner to the Garden City Land and Immigration Company, nor any vice in its assignment of an interest in its sales agency contract to the Kansas City real-estate dealers, nor to McCarty. The written terms—the ostensible terms—under which McCarty's services were enlisted were without guile. The adding of the agreed percentages, etc., for all the interested real-estate agencies to the owner's net price did not require a pricing of the lands to buyers at a figure beyond their worth, $70 to $100 per acre. As to McCarty's agency to find purchasers for these lands, that matter does not reach the crux of this case, whether proved or conceded, for the all-important reason that a real-estate agent has no power to bind his principal by a written contract to convey land unless such agent holds a power of attorney or similar authority in writing and signed by the principal. In *Artz v. McCarthy,* 109 Kan. 355, 199 Pac. 99, it was held:

"A real-estate dealer with whom a landowner has listed realty for sale has no authority to enter into a written contract obligating his principal to sell and convey the property unless such authority is conferred upon the agent in writing as prescribed by the statute of frauds, sections 4888 and 4889 of the General Statutes of 1915." (Syl. ¶ 2.)

See, also, *Sullivant v. Jahren,* 71 Kan. 127, 79 Pac. 1071; *McKibben v. Wilson,* 105 Kan. 200, 182 Pac. 638; 4 R. C. L. 262. If an

agent transcends his authority, as where he accepts a payment on the purchase price of real estate pursuant to a contract he had no power to make, and the principal has neither received the money nor authorized the agent to receive it in his behalf, the agent binds himself and not his principal. (*Simmonds v. Long,* 80 Kan. 155, 101 Pac. 1070; *Crosby v. Livingston,* 105 Kan. 418, 185 Pac. 284.) In *Halsell et al. v. Renfrew and Edwards,* 14 Okla. 674, where Renfrew listed property for sale with Shields, a real-estate dealer, and the latter found a purchaser from whom he received $500 as part payment of the purchase price, it was held that Shields was the buyer's agent to deliver the money to the seller. The court said:

"The check was given to Shields as a payment upon an agreement to sell made by him without authority, and which could not be enforced and which was in fact never fully ratified by either the plaintiffs or defendants. Shields was not the agent of Renfrow to collect the purchase money or make a conveyance; his authority to find a purchaser carried with it no implied authority to collect the purchase money when the land was sold. The plaintiffs by giving a check payable to Shields personally made him their agent to deliver the money to Renfrow, and Renfrow never has received or accepted the money. If the check had been made payable to Renfrow, and he had endorsed it and collected the proceeds, a different rule would apply. We cannot hold under all the circumstances that Renfrow has ever in fact or in contemplation of law accepted anything from the plaintiffs, and hence he is not concluded from asserting his defense." (p. 694.)

In *Rhode v. Marquis,* 135 Mich. 48, the headnote states a case which recognizes the same principle. It reads:

"Testimony that defendant acknowledged drawing a contract and deed for the sale of lands, that the sale had been made by a real-estate agent who had always done her business, that she had great confidence in him, and offered to compromise to avoid litigation, has no tendency to show that the real-estate agent acted as her agent in receiving payments on the contract after she had sold the contract to him."

But here, by the testimony of plaintiff and all the evidence, McCarty never pretended to act as the agent of either of the Garden City corporations. Plaintiff was not misled into believing he was dealing with anybody except McCarty. Whatever powers of agency may have been conferred on McCarty by giving him an interest in the written contract between the land-owning company and the land-selling company, or by the written contract between the land-selling company and McCarty, those contracts were certainly no evidence of something contrary to what they professed to be or different from the terms specified therein. (*Brown v. Gilpin,* 75 Kan. 773, syl. ¶¶ 2, 3, 90 Pac. 267.) The contract which plaintiff and Mc-

Carty signed was induced by fraud, certainly, but it was made on McCarty's behalf; not on behalf of any principal other than himself. And since there was no evidence that McCarty had authority to bind the appellees to plaintiff in a written contract, and no authority from defendants to receive in their behalf $20,000 or any other sum for the purchase of land, and as it is not pretended that any part of the payment ever reached the hands of either of the appellees, they were not liable to plaintiff on any theory of responsibility as principals for the fraud of McCarty, so on that phase of the case the demurrer was properly sustained.

. We note the argument of counsel that agency could be established by facts and circumstances. Granted, but plaintiff will need to go further and show "by facts and circumstances" or otherwise that defendants or either of them were liable as McCarty's principals in making the contract with plaintiff, or by receiving the bonds in payment, or through ratification. This the plaintiff had not done at the time the demurrer to plaintiff's evidence was interposed.

But on the other point urged by appellant, a majority of the court hold that this case should have gone to the jury on the question of conspiracy. That the plan of selling the lands, considered as a whole, was a gross fraud is clear. The magnitude of the undertaking and the gigantic scale upon which so gross a fraud was conducted almost precludes the possibility that defendants were ignorant of it. It seems impossible that it could have been operated with any hope of success without the knowledge and assistance of defendants. In view of the gross fraud and the magnitude of its operations, the fact that defendants had contracts, prepared in advance, stuck away somewhere, which were kept secret from plaintiff and all ultimate purchasers, and which could be brought out and used in defense of an action such as this, might tend to establish their fraudulent connection with the transaction as a whole, rather than to relieve them of liability. To weigh the evidence was the function of the jury, to whom it should have been submitted.

It follows that the judgment of the district court must be reversed and the cause remanded for further proceedings consistent herewith. And since this will necessitate a new trial *in toto,* nothing stated herein is intended to bar the plaintiff from seeking, in such new trial, to fasten liability on defendants or either of them as principals of McCarty or as his coconspirators.

It is so ordered.

Yates v. Sugar and Land Co. *et al.*

DAWSON, J. (dissenting in part): I can discern no evidence tending to establish a conspiracy on the part of the land-owning company or the land-selling company to aid McCarty in swindling the plaintiff. There is no pretense that either of these companies was to profit or that either did profit by McCarty's misdeeds. True, a sale of land by McCarty at an exorbitant price would naturally yield to the landowner its reasonable price and to the land-selling company its reasonable added commission. But without knowledge of McCarty's fraudulent conduct inducing such sale, such a result would not involve them in a legal liability for the fraud of McCarty. To fasten liability on either defendant as a coconspirator of McCarty, it would have had to be shown by *some* evidence that such defendant had knowledge of the fraud which McCarty planned to perpetrate on plaintiff and had an intention to assist him in its accomplishment (*Morrow v. Comm'rs of Saline Co.*, 21 Kan. 484, 509), or aided, encouraged and participated knowingly in defrauding plaintiff. (*Monroe v. Longren*, 87 Kan. 342, 124 Pac. 367; 5 R. C. L. 1065, 1066.) There was no evidence that either of the defendant corporations knew anything of McCarty's plan to swindle plaintiff, nor that either of them knowingly aided or participated in the fraud, or that either of defendant corporations knew anything about plaintiff's transaction with McCarty until after plaintiff had parted with his Liberty bonds pursuant to the written contract between himself and McCarty. Therefore liability cannot be fastened on either of appellees on any tangible theory of conspiracy, and in my judgment the trial court committed no error in sustaining a demurrer to plaintiff's evidence.

BURCH and MASON, JJ., join in this partial dissent.